**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

_____
                                        )
HARRISON COUNTY, MISSISSIPPI, *et al.*  )
                                        )
                Plaintiffs,             )
                                        )
        v.                              )        Case No. 1:24-cv-21-LG-BWR
                                        )
U.S. ARMY CORPS OF ENGINEERS,           )
                                        )
                Federal Defendant.      )
_____)


**MEMORANDUM OF LAW IN SUPPORT OF FEDERAL**
**DEFENDANT'S MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................... 1

FACTUAL BACKGROUND ................................................................................... 2

   I.   The Bonnet Carré Spillway ........................................................................ 2

   II.   Bottlenose Dolphins .................................................................................. 4

STATUTORY BACKGROUND ............................................................................ 5

   I.   Marine Mammal Protection Act ................................................................ 5

   II.   Administrative Procedure Act .................................................................... 7

STANDARD OF REVIEW .................................................................................... 8

ARGUMENT ......................................................................................................... 9

   I.   Plaintiffs Have Not and Cannot Plead Facts Sufficient to Show Standing ......................... 9

     A. Plaintiffs Have Not Established Injury-in-fact. ................................................. 10

       i.   Plaintiffs Have Not Established Injury to Proprietary Interests. ............................... 10

       ii.   Plaintiffs Have Not Established Representational or Organizational Injury. ............. 13

       iii.   Plaintiffs Have Not Established a Procedural Injury. ................................................ 14

     B.   Plaintiffs Have Not Established and Cannot Establish Causation. ................................ 14

     C.   Plaintiffs Cannot Establish Redressability. ................................................................. 16

   II.   Plaintiffs Have Failed to State a Claim Upon Which Relief Can Be Granted. ............. 17

CONCLUSION ..................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**                                                                                                  **Page(s)**

*Arias-Benn v. State Farm Fire & Cas. Ins. Co.*,
   495 F.3d 228 (5th Cir. 2007) .................................................................................. 9

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................... 9, 19

*Beck v. U.S. Dep't of*,
   Com., 982 F.2d 1332 (9th Cir. 1992) ..................................................................... 8

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 554 (2007) ......................................................................................... 9

*City of Hearne v. Johnson*,
   929 F.3d 298 (5th Cir. 2019) ................................................................................ 14

*City of Olmsted Falls v. FAA*,
   292 F.3d 261 (D.C. Cir. 2002) ....................................................................... 10, 11

*City of Safety Harbor v. Birchfield*,
   529 F.2d 1251 (5th Cir. 1976) ............................................................................. 10

*City of Sausalito v. O'Neill*,
   386 F.3d 1186 (9th Cir. 2004) ............................................................................. 10

*Crane v. Johnson*,
   783 F.3d 244 (5th Cir. 2015) ................................................................................ 8

*Crawford v. Hinds Cnty. Bd. of Supervisors*,
   1 F.4th 371 (5th Cir. 2021) .................................................................................. 16

*Ctr. for Biological Diversity v. EPA*,
   861 F.3d 174 (D.C. Cir. 2017) ............................................................................. 15

*Ctr. for Biological Diversity v. Ross*,
   613 F. Supp. 3d 336 (D.D.C. 2020) ................................................................ 8, 18

*DaimlerChrysler Corp. v. Cuno*,
   547 U.S. 332 (2006) ......................................................................................... 8

*El Paso Cty. v. Trump*,
   982 F.3d 332 (5th Cir. 2020) ........................................................................ 10, 12

*Fort Bend Cnty. v. U.S. Army Corps of Eng'rs*,
    59 F.4th 180 (5th Cir. 2020) ............................................................... 19

*Friends of the Earth v. Laidlaw Env't Servs. (TOC)*,
    528 U.S. 167 (2000) ................................................................... 9, 16

*FW/PBS v. City of Dallas*,
    493 U.S. 215 (1990) ........................................................................ 10

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ........................................................................ 10

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ........................................................................ 18

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) ........................................................................ 10

*In re Katrina Canal Breaches Litig.*,
    495 F.3d 191 (5th Cir. 2007) ............................................................. 9

*La. Fair Hous. Action Ctr. v. Azalea Garden Props.*,
    82 F.4th 345 (5th Cir. 2023) ............................................................ 14

*La Jolla Friends of the Seals v. NOAA Fisheries*,
    630 F. Supp. 2d 1222 (S.D. Cal. 2009) ............................................. 18

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) .................................................................. passim

*Norton v. S. Utah Wilderness All.*
    542 U.S. 55 (2004) ...................................................................... 8, 19

*NRDC v. Evans*,
    279 F. Supp. 2d 1129 (N.D. Cal. 2003) ............................................. 8

*Papasan v. Allain*,
    478 U.S. 265 (1986) .......................................................................... 9

*Sierra Club v. Glickman*,
    156 F.3d 606 (5th Cir. 1998) ...................................................... 15, 17

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ............................................................................ 9

*Stockman v. Fed. Election Comm'n*,
    138 F.3d 144 (5th Cir. 1998) ............................................................................ 8

*Summers v. Earth Island, Inst.*,
    555 U.S. 488 (2009) ......................................................................................... 14

*Swindol v. Aurora Flight Scis. Corp.*,
    805 F.3d 516 (5th Cir. 2015) ............................................................................ 3

*Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*,
    714 F.3d 186 (4th Cir. 2013) ........................................................................... 18

*Wild Fish Conservancy v. Jewell*,
    730 F.3d 791 (9th Cir. 2013) ........................................................................... 18

**Statutes**

5 U.S.C. § 551(13) ......................................................................................... 7, 18

5 U.S.C. § 702 ..................................................................................................... 7

5 U.S.C. § 704 ..................................................................................................... 7

5 U.S.C. § 706(1) ................................................................................................ 7

5 U.S.C. § 706(2)(A) ........................................................................................... 7

16 U.S.C. § 1361(2) ............................................................................................ 5

16 U.S.C. § 1362(10) .......................................................................................... 6

16 U.S.C. § 1362(12)(A)(i) ................................................................................. 6

16 U.S.C. § 1362(13) .......................................................................................... 5

16 U.S.C. § 1362(18)(A) ..................................................................................... 5

16 U.S.C. § 1371 ................................................................................................. 8

16 U.S.C. § 1371(a) ............................................................................................ 5

16 U.S.C. § 1371(a)(5)(A) ................................................................................ 19

16 U.S.C. § 1371(a)(5)(A)(i) .............................................................................. 6

16 U.S.C. § 1371(a)(5)(A)(i)(I) .......................................................................... 6

16 U.S.C. § 1371(a)(5)(A)(II) ................................................................................... 7

16 U.S.C. § 1371(a)(5)(D)(i) ..................................................................................... 6

16 U.S.C. § 1372(a) ................................................................................................... 5

16 U.S.C. § 1375(a)(1) ............................................................................................... 7

16 U.S.C. § 1387 ........................................................................................................ 8

16 U.S.C. § 1536(a)(2) ............................................................................................... 7

33 U.S.C. § 702a ........................................................................................................ 2

42 U.S.C. § 4332(2)(C) .............................................................................................. 7

**Rules**

Fed. R. Civ. P. 12(b)(1) ..................................................................................... 2, 8, 20

Fed. R. Civ. P. 12(b)(6) .............................................................................................. 2

**Regulations**

50 C.F.R. 216.104(a) .................................................................................................. 6

50 C.F.R. 216.106 ...................................................................................................... 7

50 C.F.R. § 216.3 ....................................................................................................... 5

**Other Authorities**

Pub. L. No. 70-391 ..................................................................................................... 2

**TABLE OF ACRONYMS & ABBREVIATIONS**

| | |
|---|---|
| APA | Administrative Procedure Act |
| Association | Mississippi Hotel and Lodging Association |
| Corps | United States Army Corps of Engineers |
| ESA | Endangered Species Act |
| IMMS | Institute for Marine Mammal Studies |
| MMPA | Marine Mammal Protection Act |
| MR&T | Mississippi River and Tributaries |
| MSCFU | Mississippi Commercial Fisheries United, Inc. |
| NEPA | National Environmental Policy Act |
| NMFS | National Marine Fisheries Service |
| NOAA Fisheries | National Oceanic and Atmospheric Administration Fisheries (another name for NMFS) |
| UME | Unusual Mortality Event |

## INTRODUCTION

This lawsuit raises Plaintiffs' newest challenge to how the U.S. Army Corps of Engineers (the "Corps") manages and operates the Bonnet Carré Spillway (or "the Spillway").[1] This time, claiming interests in bottlenose dolphins, Plaintiffs seek to compel the Corps to apply to the National Oceanic and Atmospheric Administration Fisheries ("NOAA Fisheries" or the National Marine Fisheries Service ("NMFS")) for authorization to incidentally take bottlenose dolphins under the Marine Mammal Protection Act ("MMPA") before opening the Spillway again. Because the MMPA does not contain a citizen suit provision, Plaintiffs have pled their claims under the Administrative Procedure Act ("APA"). This lawsuit is deficient and should be dismissed for two main reasons.

First, Plaintiffs have failed to establish the three required elements of Constitutional standing. Plaintiffs' allegations of injury stemming from bottlenose dolphin deaths are vague and conclusory. Their Complaint provides threadbare support to connect the Corps' MMPA authorization decisions related to the Bonnet Carré Spillway with Plaintiffs' alleged injuries. And Plaintiffs have not shown that the Corps "engag[ing] in the incidental take permitting process under the [MMPA]" would redress their alleged injuries. Compl. ¶ 6(1). Therefore, the Court lacks jurisdiction over Plaintiffs' claims.

Second, Plaintiffs have failed to state a cognizable claim for which relief can be granted. Unlike other environmental statutes, such as the Endangered Species Act ("ESA") or NEPA, the

---

[1] Plaintiffs include Mississippi cities and counties as well as the Mississippi Hotel and Lodging Association and Mississippi Commercial Fisheries United, Inc. *See* Complaint for Declaratory and Injunctive Relief, ECF No. 1 (hereinafter, "Compl."). As this Court is aware, the same plaintiffs previously sued the Corps about Bonnet Carré Spillway operations pursuant to the National Environmental Policy Act ("NEPA") and Magnuson-Stevens Fishery Conservation and Management Act. *Harrison County, Mississippi, et al, v. U.S. Army Corps of Engineers*, No. 1:19-cv-986-LG-RHW (S.D. Miss.).

MMPA's provisions related to incidental take authorizations do not include automatic, mandatory consultation or procedural requirements. Instead, a U.S. citizen taking action retains discretion to decide whether to apply for an authorization. If the U.S. citizen does not apply for and obtain an authorization, and an illegal "take" occurs within the meaning of the MMPA, then NMFS (and not private citizens) has discretion to proceed with an enforcement action. Plaintiffs have not alleged facts to show that the Corps will open the Spillway in the next five years (the maximum duration of an MMPA incidental take authorization) or that an opening will cause illegal "take" of bottlenose dolphins such that the Corps must apply for an incidental take authorization or else violate the MMPA. Thus, Plaintiffs have no legal basis for interfering, or asking this Court to get involved, with the Corps' decision whether to apply to NMFS for an incidental take authorization.

For these reasons, and as explained more fully below, Plaintiffs have failed to sufficiently allege standing and to state a claim upon which relief can be granted. Therefore, the Court should dismiss Plaintiffs' Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## FACTUAL BACKGROUND

### I.   The Bonnet Carré Spillway

The Bonnet Carré Spillway is an important element of the Mississippi River and Tributaries ("MR&T") Project authorized by Congress in 1928. 1928 Flood Control Act, Pub. L. No. 70-391, 45 Stat. 534; 33 U.S.C. §702a. Located about 33 miles upriver of New Orleans in St. Charles Parish, Louisiana, it was constructed to reduce severe flood damage and loss of life in the New Orleans metropolitan area, and other downstream communities, caused by high flood stages along the Mississippi River. *See* Bonnet Carré Spillway Booklet, U.S. Army Corps of Engineers New Orleans District,

https://www.mvn.usace.army.mil/Portals/56/docs/Recreation/BCS/Brochures/BC%20spillway%20booklet%20Dec%202018%20.pdf (last visited March 25, 2024).[2] The Spillway's control structure is a mechanically controlled concrete weir which extends for more than a mile and a half parallel to the Mississippi River and features 350 bays that can be opened to release water. *Id.* When the Corps opens the Spillway, a portion of the Mississippi River flows are diverted to Lake Pontchartrain via a nearly six-mile floodway. *Id.*

Operational protocols for the Spillway were set forth in the Chief of Engineer's Report (also known as the Jadwin Report) submitted to Congress in 1928. *See* Chief of Engineers' Report to Congress, H.R. Doc. No. 70-90 (1928). The Spillway's governing Water Control Manual, first published in 1984 and revised in 1999, implements these protocols with greater detail. *See generally Harrison County, Mississippi*, No. 1:19-cv-986-LG-RHW (S.D. Miss.) at 16-1 (Ex. A, Water Control Manual). The Water Control Manual explains that, along with other MR&T features, the purpose of the Spillway is to "divert sufficient floodwater from the Mississippi River to minimize flood damages in the lower river reaches and prevent the discharge in the Mississippi River from exceeding 1,250,000 [cubic feet per second "cfs"] at New Orleans." *Id.* at 2-1. In the 91 years since completion of the Spillway, it has been opened 15 times.[3] Most recently, the Spillway was opened from February 27 to April 11, 2019; May 10 to July 27, 2019; and April 3 to May 1, 2020.

---

[2] The Court may take judicial notice of public available information on government websites. *See, e.g.*, *Swindol v. Aurora Flight Scis. Corp.*, 805 F.3d 516, 518-19 & n.2 (5th Cir. 2015) (taking judicial notice of public records available on state government website).

[3] *See* Historic Operations of the Bonnet Carré Spillway, U.S. Army Corps of Eng'rs, https://www.mvn.usace.army.mil/Missions/Mississippi-River-Flood-Control/Bonnet-Carre-Spillway-Overview/Historic-Operation-of-Bonnet-Carre/ (last visited March 25, 2024); Spillway Operation Information, U.S. Army Corps of Eng'rs, https://www.mvn.usace.army.mil/Missions/Mississippi-River-Flood-Control/Bonnet-Carre-Spillway-Overview/Spillway-Operation-Information/ (last visited March 25, 2024).

## II.     Bottlenose Dolphins

Bottlenose dolphins (*Tursiops truncatus*) are found in temperate and tropical waters throughout the world, including along the Northern Gulf of Mexico. *See* Common Bottlenose Dolphin, NOAA Fisheries, https://www.fisheries.noaa.gov/species/common-bottlenose-dolphin (last visited March 25, 2024). They are generally gray in color and may travel alone or in groups. *Id.* They can thrive in many environments and feed on a variety of prey, such as fish, squid, and crustaceans. *Id.* Bottlenose dolphins in the United States are not listed under the ESA but, like all marine mammals, they are protected under the MMPA. *Id.* The most pressing threats to bottlenose dolphins are interactions with fishing gear, habitat destruction and degradation, biotoxins, and illegal harassment and feeding activities by humans. *Id.*

From February 1, 2019, to November 30, 2019, NMFS declared an unusual mortality event ("UME") for bottlenose dolphins along the Northern Gulf of Mexico due to a marked increase of stranded dolphins and higher than average presence of freshwater skin lesions on the stranded dolphins. *See* Frequent Questions: 2019 "Bottlenose Dolphin Unusual Mortality Event along the Northern Gulf of Mexico (CLOSED)," NOAA Fisheries, https://www.fisheries.noaa.gov/national/marine-life-distress/frequent-questions-2019-bottlenose-dolphin-unusual-mortality-event (last visited March 25, 2024). According to NMFS, "scientists determined that the most likely cause of this UME was exposure to low salinity waters in 2019 from the above average freshwater discharge into the [Northern Gulf of Mexico]." *Id.* NMFS attributed the above average freshwater discharge to a number of sources:

> These strandings coincided with a record-breaking year of precipitation (snow and rain) in the watersheds that drain into the [Northern Gulf of Mexico]. This caused an unprecedented amount of freshwater discharge during the winter, spring and summer months of 2019 which resulted in a drop in salinity levels across the coastally associated waters in the region (e.g., <10ppt). This was most pronounced and prolonged in the western Mississippi Sound due to the massive

> freshwater discharge from the Mississippi River, including its various spillways and diversions (e.g., Caernarvon diversion, Bohemia spillway, Bonnet Carré spillway).

*Id.* The UME area overlapped with the area affected by the 2010 Deepwater Horizon oil spill, and NMFS noted that not all bottlenose dolphin health conditions caused by the oil spill were fully resolved at the time of the UME, which could have made dolphins more susceptible to additional environmental stressors. *Id.*

## STATUTORY BACKGROUND

### I.     Marine Mammal Protection Act

Congress enacted the MMPA in 1972 to ensure that marine mammals are not "permitted to diminish beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part." 16 U.S.C. § 1361(2). Except as expressly provided in the statute, it is unlawful "to take any marine mammal" in "waters or on lands under the jurisdiction of the United States" or "on the high seas." *Id*. §§ 1372(a), 1371(a); 50 C.F.R. § 216.3. "Take" under the MMPA means "to harass, hunt, capture, or kill . . . any marine mammal" or to attempt to do so. 16 U.S.C. § 1362(13). "Harassment" is "any act of pursuit, torment, or annoyance which –

> (i)     has the potential to injure a marine mammal or marine mammal stock in the wild; or
>
> (ii)    has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering."

*Id.* § 1362(18)(A).

However, the MMPA provides some exceptions to the moratorium. As relevant here, the MMPA allows citizens of the United States[4] who engage in a "specified activity (other than commercial fishing)" within a "specified geographical region" to request authorization for the "incidental, but not intentional" taking, including the "harassment," of "small numbers of marine mammals of a species or population stock" pursuant to that activity for a period of no more than five consecutive years. *Id.* § 1371(a)(5)(A)(i), (a)(5)(D)(i). If a U.S. citizen decides to apply for an incidental take authorization, it must include 14 specific pieces of information in its application, including the date/s and duration of its upcoming activity. 50 C.F.R. 216.104(a). NMFS recommends that an applicant apply at least nine months, but preferably 15 months, in advance of the intended action start date, given the length of time that a Letter of Authorization takes to process. *See* NOAA Fisheries, Incidental Take Authorizations Under the Marine Mammal Protection Act, https://www.fisheries.noaa.gov/permit/incidental-take-authorizations-under-marine-mammal-protection-act (last visited March 25, 2024).

The MMPA and its implementing regulations set forth the standard by which the permitting agency (i.e., NMFS) determines whether to issue an authorization allowing the requested incidental take. The Secretary[5] "shall allow" the requested taking if, after notice and opportunity for public comment, she determines that the total taking during the five-year period will have a "negligible impact" on affected marine mammal species or stocks and will not have an "unmitigable adverse impact on the availability of such species or stock for taking for subsistence uses" by Alaska natives. 16 U.S.C. § 1371(a)(5)(A)(i)(I). To authorize incidental

---

[4] A Federal government agency, like the U.S. Army Corps of Engineers, is considered a citizen of the United States or a "person" for the purposes of the MMPA. 16 U.S.C. § 1362(10).

[5] The Secretary of Commerce, through NMFS, implements the MMPA with respect to all cetaceans and pinnipeds except walruses. 16 U.S.C. § 1362(12)(A)(i).

take under this provision, NMFS also must issue a regulation in the Federal Register that sets forth the means of effecting the least practicable adverse impact on the affected species or stocks and its habitat, and monitoring and reporting requirements. *Id.* § 1371(a)(5)(A)(II). Once that regulation is promulgated, following a public notice and comment process, NMFS may issue a "Letter of Authorization" that authorizes incidental take for up to five years. 50 C.F.R. 216.106.

Unlike other environmental statutes that contain standards triggering certain procedural requirements,[6] the MMPA does not contain any pre-take trigger point or standard by which a U.S. citizen knows it must apply for an incidental take authorization; the decision to apply for such authorization is discretionary. If a U.S. citizen does not apply for and obtain an incidental take authorization and then causes take of a marine mammal, NMFS can pursue enforcement action against them. *See* 16 U.S.C. § 1375(a)(1).

## II.    Administrative Procedure Act

The judicial review provision of the APA provides a limited cause of action for review of "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. The APA defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* § 551(13). The reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed," *id.* § 706(1), and "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A); *see also id.* § 702

---

[6] Compare with the procedural requirements triggering consultation under the ESA, 16 U.S.C. § 1536(a)(2), or triggering environmental analysis before undertaking any major Federal actions significantly affecting the quality of the human environment under NEPA, 42 U.S.C. § 4332(2)(C), for example.

("Nothing herein . . . affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground"). "[T]he only agency action that can be compelled under the APA is action legally *required*." *Norton v. S. Utah Wilderness All. ("SUWA")*, 542 U.S. 55, 63 (2004) (emphasis in original).

The MMPA does not contain a citizen-suit provision, thus challenges must be brought under the APA. *See* 16 U.S.C. §§ 1371, 1387; *accord Ctr. for Biological Diversity v. Ross*, 613 F. Supp. 3d 336, 341 (D.D.C. 2020) (noting that MMPA claims are properly pled under the APA) (citing *NRDC v. Evans*, 279 F. Supp. 2d 1129, 1142 (N.D. Cal. 2003) ("Citizens challenging actions done under the MMPA must sue under the APA."); *Beck v. U.S. Dep't of Com.*, 982 F.2d 1332, 1338 (9th Cir. 1992) (noting "that the MMPA does not provide for citizen enforcement of the Act")).

**STANDARD OF REVIEW**

The Corps moves to dismiss the Plaintiffs' Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) for lack of jurisdiction and failure to state a claim upon which relief can be granted. Plaintiffs bear the burden of establishing that the court has jurisdiction, *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), and must do so "for each claim [it] seeks to press," *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006); *see also Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998). In deciding a Rule 12(b)(1) motion, a court need not limit itself to the complaint and may consider materials outside the pleadings as it deems appropriate to resolve the question of whether it has jurisdiction. *Crane v. Johnson*, 783 F.3d 244, 250–51 (5th Cir. 2015). If the plaintiff cannot meet its burden, and "it appears that subject matter jurisdiction is lacking," then the court is required to dismiss the case, without reaching the merits. *Stockman*, 138 F.3d at 151.

To survive a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a complaint must contain facts sufficient "to raise a right to relief above the speculative level" and to satisfy the court that the claim is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555, 570 (2007). A claim is plausible only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556-57). The complaint must "permit the court to infer more than the mere possibility of misconduct." *Id.* at 679. Although all well-pled allegations are presumed to be true and are viewed in the light most favorable to the plaintiff, *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007), "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Similarly, a court need not accept as true a plaintiff's "conclusory allegations, unwarranted factual inferences, or legal conclusions," *Arias-Benn v. State Farm Fire & Cas. Ins. Co.*, 495 F.3d 228, 230 (5th Cir. 2007), or "a legal conclusion couched as a factual allegation[.]" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

## ARGUMENT

### I.     Plaintiffs Have Not and Cannot Plead Facts Sufficient to Show Standing.

Whether a plaintiff has standing to sue is a threshold jurisdictional question. *See, e.g.*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101-02 (1998). To satisfy Article III's standing requirements, a plaintiff must show "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the*

*Earth v. Laidlaw Env't Servs. (TOC)*, 528 U.S. 167, 180-81 (2000) (citing *Lujan*, 504 U.S. at 560-61). The burden of establishing these elements rests squarely on a plaintiff, who must meet the burden by alleging facts that "affirmatively" and "clearly" demonstrate standing. *FW/PBS v. City of Dallas*, 493 U.S. 215, 231 (1990).

### A. Plaintiffs Have Not Established Injury-in-fact.

Plaintiffs are four local governments and two non-profit organizations. A local government plaintiff may not simply assert the particularized injuries to the concrete interests of its citizens on their behalf but may sue to protect its own "proprietary interests" which might be congruent with those of its citizens. *El Paso Cty. v. Trump*, 982 F.3d 332, 338 (5th Cir. 2020); *see also City of Safety Harbor v. Birchfield*, 529 F.2d 1251, 1256 n.7 (5th Cir. 1976). As to organizational plaintiffs, they must show either that they have "representational standing," which is contingent upon the ability of at least one of their members to bring suit, or that they have "organizational standing," which turns instead on whether each organization itself suffered an injury-in-fact. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982). If suing on behalf of their members, organizations must show that their members meet the threshold requirements for standing. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342 (1977). In this case, Plaintiffs have not sufficiently alleged injury-in-fact.

### i. Plaintiffs Have Not Established Injury to Proprietary Interests.

In other circuits, courts have found standing for a municipality when concrete harm to its aesthetic or economic interests have been alleged. *See, e.g.*, *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004) (finding concrete harm where city manager's declaration described specific ways that defendants' plan to renovate and expand an old Army fort would result in detrimental effects to tax revenue, traffic, city management, and public safety functions); *City of*

*Olmsted Falls v. FAA*, 292 F.3d 261, 268 (D.C. Cir. 2002) (finding sufficient harm alleged to city's economic interests from planned airport construction). In this case, the four local government plaintiffs rely on conclusory statements of harm rather than concrete and actual or imminent injuries.

As to the City of Biloxi, the Complaint alleges that the opportunity to see bottlenose dolphins in the Mississippi Sound is important for tourism, as well as the "cultural, spiritual, and economic wellbeing" of Biloxi citizens and visitors. Compl. ¶ 9. However, the Complaint does not describe a concrete injury to the City of Biloxi from the Corps not applying for an MMPA incidental take authorization. Instead, without supporting data, the Complaint alleges "immeasurable" loss to Biloxi if bottlenose dolphins can no longer be experienced in the Mississippi Sound, and the conclusory statement that "Biloxi's interests and those of its citizens have been and will be harmed by the Corps failure to act in the permitting process for incidental take of bottlenose dolphins." *Id.*. There is no mention of how the Corps' lack of an incidental take authorization during the 2019 (or any other) Spillway openings caused an actual, particularized injury to Biloxi. Nor is there any explanation of how the Corps opening the Spillway at an undetermined time in the future without applying for and obtaining an incidental take authorization for bottlenose dolphins will lead to imminent harm to Biloxi's tourism or cultural wellbeing, rather than conjectural or hypothetical harm.

The City of Pass Christian, Mississippi fares no better. Plaintiffs' Complaint makes no attempt to allege a specific injury, instead offering the vague and conclusory statement that Pass Christian's "proprietary interests and those of its citizens have been and will be harmed in the same manner as Biloxi's by the Corps' failure to act as detailed in this complaint." *Id.* at ¶ 12. There is no mention of how the Corps' lack of an incidental take authorization during the 2019

(or any other) Spillway openings caused an actual injury to Pass Christian. Indeed, the Complaint fails to describe any of Pass Christian's specific proprietary interests that have been or will be harmed.

As to Harrison County, Mississippi, the Complaint mentions tourism as a "mainstay of the County's economy and the well-being of its residents." *Id.* at ¶ 10. The Complaint also describes how the Institute for Marine Mammal Studies ("IMMS") is based in Harrison County. *Id.* However, the IMMS is not a county owned or operated institute, but rather "a non-profit organization that provides research and education about marine mammal populations, including the bottlenose dolphin." *Id.* The Complaint alleges that harm in general to the bottlenose dolphin in the Mississippi Sound "harms the IMMS' scientific and educational mission, and by extension harms Harrison County and its citizens." *Id.* Even if harm to IMMS could equate to harm to the County or its citizens, which it cannot, a county may not assert the injuries of its citizens (or local organizations) on their behalf as *parens patriae*. *El Paso Cty.*, 982 F.3d at 338. The Complaint also repeats the lamentation of Biloxi and Pass Christian – that its "proprietary interests and those of its citizens have been and will be harmed in the same manner as Biloxi's by the failure of the Corps to act as detailed in this complaint." Compl. ¶ 10. This conclusory statement does not establish a particularized, actual, or imminent harm specific to the Corps not applying for an MMPA incidental take authorization.

Finally, the City of D'Iberville, Mississippi offers the most threadbare assertion of injury. The Complaint merely offers a geographic description of D'Iberville as a city that "borders the body of water" that is "part of an estuary that includes the Mississippi Sound and is also habitat for the bottlenose dolphin." *Id.* at ¶ 11. The Complaint does not mention proprietary interests of

D'Iberville. Nor is there even a conclusory statement that the City of D'Iberville has been or is harmed by the Corps not applying for an MMPA incidental take authorization.

Accordingly, none of the four local government Plaintiffs have sufficiently alleged an injury to their proprietary interests necessary to show standing.

### ii.  Plaintiffs Have Not Established Representational or Organizational Injury.

The two non-profit Plaintiffs are the Mississippi Hotel and Lodging Association ("the Association") and the Mississippi Commercial Fisheries United, Inc. ("MSCFU"). As to the Association, the Complaint lists several members in the abstract – "hotels, Convention and Visitors Bureaus, Chambers of Commerce, Welcome Centers, and others" – but does not name a specific member that has been or will be harmed by the Corps not applying for an incidental take authorization under the MMPA. Compl. ¶ 13. As to the MSCFU, the Complaint does not list any members, even in the abstract, although the MSCFU's members' interests are broadly described as "the health of their businesses, and the aesthetic, recreational, cultural and spiritual values provided by the Mississippi Sound and its bottlenose dolphin population." *Id.* at ¶ 14.  The Complaint attempts to establish harm to both the Association's and MSCFU's members with the identical vague and conclusory statements that their "members have been and will be harmed by the Corps' failure to act as detailed in this complaint." *Id.* at ¶¶ 13, 14. Without specific factual allegations of particularized harm to identifiable members, the non-profit Plaintiffs have failed to establish representational standing.

In addition to not establishing that individual members have standing, the non-profit Plaintiffs make no effort to establish that they have standing to sue as organizations. The Complaint merely claims that "the Association's own interests" and "MSCFU's own interests" "have been and will be harmed by the Corps' failure to act as detailed in this complaint," but

13

provide no further explanation for what those organizational interests are or how they have been harmed. *Id.* at ¶¶ 13, 14. This is not sufficient to establish organizational standing. *Cf. La. Fair Hous. Action Ctr. v. Azalea Garden Props.*, 82 F.4th 345, 351 (5th Cir. 2023) (describing how an organization can "establish a cognizable injury by showing its ability to pursue its mission is perceptibly impaired because it has diverted significant resources to counteract the defendant's conduct" (internal quotations omitted)).

### iii.   Plaintiffs Have Not Established a Procedural Injury.

A procedural injury occurs "when a defendant fails to follow a [] procedure, [] and this failure increases the risk of future harm." *City of Hearne v. Johnson*, 929 F.3d 298, 301 (5th Cir. 2019). However, a "deprivation of a procedural right without some concrete interests that is affected by the deprivation – a procedural right *in vacuo* – is insufficient to create Article III standing." *Summers v. Earth Island, Inst.*, 555 U.S. 488, 496 (2009). To the extent that Plaintiffs allege a procedural injury from the Corps not applying for an MMPA incidental take authorization, they have failed to make such a showing because, for the reasons explained above, they have failed to allege facts establishing any concrete interests affected by the deprivation.

### B.   Plaintiffs Have Not Established and Cannot Establish Causation.

In addition to failing to allege facts establishing the existence of a legally cognizable injury-in-fact, Plaintiffs have also failed to prove that their alleged injury is caused by the Federal Defendant. *Lujan*, 504 U.S. at 560. Here, Plaintiffs' theory of causation is as follows: the Corps' "failu[re] to engage in the incidental take permitting process under the [MMPA]" meant that the Corps did not have to "evaluate means of mitigating the impacts to the bottlenose dolphin population affected by the operations of the Bonnet Carré Spillway" which meant that the Corps operated the Spillway in 2019 "in a manner that result[ed] in taking of bottlenose

dolphins" and may do so again at some unspecified time in the future. Compl. ¶¶ 6, 33, 37. This theory of causation, pieced together from multiple paragraphs in the Complaint, rests on assumptions about discretionary permitting decisions.

Plaintiffs do not identify how the specific action challenged here—the Corps' alleged failure to apply to NMFS for an incidental take authorization under the MMPA—is connected to the take of bottlenose dolphins. Any speculation by Plaintiff about the outcome of the authorization process, such as whether NMFS would find that Spillway openings meet certain criteria or whether the Corps would actually have to implement "means of mitigating the impacts . . . of the Bonnet Carré Spillway[,]" are purely hypothetical. *Id.* at ¶ 33. Plaintiffs cannot establish causation by relying on guesswork about what internal agency permitting decisions could look like. The attenuated chain of assumptions that Plaintiffs use to connect the challenged inaction and their alleged injuries is too speculative. *Cf. Lujan*, 504 U.S. at 566 ("[s]tanding is not an ingenious academic exercise in the conceivable") (internal citation omitted).

To the extent that Plaintiffs allege a procedural injury in this case, they still must show two causal links: "one connecting the omitted [procedural step] to some substantive government decision that may have been wrongly decided because of the lack of [that procedural requirement] and one connecting that substantive decision to the plaintiff's particularized injury." *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 184 (D.C. Cir. 2017); *see also Sierra Club v. Glickman*, 156 F.3d 606, 613 (5th Cir. 1998) (in procedural rights case, "the plaintiff must establish that the injury is fairly traceable to the proposed government action or inaction"). For the same reasons described above, Plaintiffs have not made this showing.

### C.      Plaintiffs Cannot Establish Redressability.

Plaintiffs also fail to make the final showing to establish standing: that the relief they seek is likely to redress their injuries. *Lujan*, 504 U.S. at 570-71. First, to the extent Plaintiffs allege injuries from the 2019 UME, those injuries occurred five years ago and cannot be redressed by a forward-looking authorization application process. *See Crawford v. Hinds Cnty. Bd. of Supervisors*, 1 F.4th 371, 375 (5th Cir. 2021) ("Past wrongs are evidence of the likelihood of a future injury but do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy." (internal quotations omitted)).

Second, regarding potential future injuries, even if the Court were to compel the Corps to apply for an incidental take authorization under the MMPA, bottlenose dolphins could still potentially be "taken" in the Mississippi Sound, even by the Corps. If the Corps applied for and received an incidental take authorization for opening the Spillway, the whole point is that the Corps would then be authorized to take a certain amount of bottlenose dolphins. Nor do Plaintiffs grapple with the fact that, even if the Corps applied for and obtained an incidental take authorization, the Corps may not need to open the Spillway during the five-year duration of the permit, and yet bottlenose dolphins may die during that time from other causes. *See* NOAA, Common Bottlenose Dolphin, https://www.fisheries.noaa.gov/species/common-bottlenose-dolphin (last visited March 25, 2024) (listing "a variety of human-caused and natural threats and stressors"). Throughout their Complaint, Plaintiffs offer conclusory statements about redressability but offer nothing specific in support. *See* Compl. ¶¶ 10-14, 37. The remedy sought here is not *likely*, as opposed to merely speculative, to redress any alleged future injuries. *Friends of the Earth*, 528 U.S. at 181.

To the extent that Plaintiffs allege a procedural injury in this case, they are not held to the normal standard for redressability, but nonetheless must show "that there is a possibility that the procedural remedy will redress [their] injury." *Glickman*, 156 F.3d at 613. "In order to make this showing, the plaintiff must show that the procedures in question are designed to protect some threatened concrete interest of its that is the ultimate basis of its standing." *Id.* (internal quotations omitted). Here, Plaintiffs have not attempted to show that the discretionary decision of the Corps applying for an incidental take authorization under the MMPA is designed to protect Plaintiffs' alleged interests in seeing bottlenose dolphins. For all these reasons, Plaintiffs have not established and cannot establish redressability from their relief sought.

## II.     Plaintiffs Have Failed to State a Claim Upon Which Relief Can Be Granted.

Even if the Court finds that Plaintiffs have met their standing burden at this stage, it still should dismiss Plaintiffs' Complaint for failure to state a claim upon which relief can be granted. Plaintiffs' Complaint sets forth two allegations: (1) the Corps' "taking of bottlenose dolphins in 2019 constitutes an agency action contrary to law under Section 706 of the [APA] in that it is contrary to the taking moratorium in the [MMPA,]" and (2) the Corps' "failure to apply for an incidental take authorization" "in accordance with the [MMPA]" is agency action "unlawfully withheld or unreasonably delayed[.]" Compl. ¶¶ 35, 36. The first allegation falls under APA Section 706(2)(A) ("contrary to law"), while the second allegation falls under APA Section 706(1) ("unlawfully withheld or unreasonably delayed"). Neither allegation raises an actionable violation of the MMPA.

Regarding Plaintiffs' first allegation, Plaintiffs fail to identify any final agency action by the Corps, as required to bring a claim under APA Section 706(2). Plaintiffs state that the "taking . . . constitutes an agency action contrary to law under [the APA]" but that is incorrect. *Id.* ¶ 35.

17

The alleged "taking" was not a decision made or challengeable final agency action by the Corps. *Cf.* 5 U.S.C. § 551(13). Rather, Plaintiffs challenge the purported *effect* in 2019 of agency action (i.e., opening the Spillway),[7] but not a final agency action in itself. Plaintiffs' first claim is more accurately viewed as an improper attempt to circumvent NMFS' Congressionally granted enforcement discretion. Congress granted authority solely to NMFS, not private parties, to enforce the MMPA's prohibition against taking marine mammals. *See, e.g.*, *Heckler v. Chaney*, 470 U.S. 821, 832 (1985) (recognizing that an agency's decision not to take enforcement action is a decision generally committed to an agency's absolute discretion); *Ctr. for Biological Diversity*, 613 F. Supp. 3d at 341 (noting that "the MMPA, unlike the ESA, does not have a citizen-suit provision"); *La Jolla Friends of the Seals v. NOAA Fisheries*, 630 F. Supp. 2d 1222, 1228 (S.D. Cal. 2009) ("the discretionary enforcement language of the MMPA does not circumscribe [NMFS'] power to discriminate among issues or cases it will pursue"). Plaintiffs cannot ask this Court to hold the Corps accountable in NMFS' place for an alleged MMPA violation. *Cf.* Compl. at 13 (asking Court to enter declaratory judgment that the Corps "acted

---

[7] Also, opening the Spillway is not a *final* agency action under the APA; the Corps' operations of the Spillway implement the existing Water Control Plan. *See Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 801 (9th Cir. 2013) (holding that plaintiff's claims "do not implicate a final agency action" because "the individual acts of closing the gates at structure 2 do not mark the consummation of the agency's decisionmaking process, because they constitute day-to-day operations that merely implement operational plans for the Hatchery." (cleaned up)); *Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 194 (4th Cir. 2013) ("Moreover, the Corps' performance in maintaining the Wilmington Harbor Project was not action that was circumscribed and discrete. . . . were a court to review the Corps' performance . . . it would then be injecting itself into the role of monitoring whether the Corps had complied with vague, undefined corrective measures. The obvious inability for a court to function in such a day-to-day managerial role over agency operations is precisely the reason why the APA limits judicial review to discrete agency actions." (cleaned up)).

contrary to law . . . in taking bottlenose dolphins through the operation of the Bonnet Carré Spillway"). The Court is not able to grant relief as to Plaintiffs' first allegation.

Plaintiffs' second allegation also fails. To state a claim under APA Section 706(1), Plaintiffs must demonstrate that the Corps has a nondiscretionary duty to act. *SUWA*, 542 U.S. at 64; *Fort Bend Cnty. v. U.S. Army Corps of Eng'rs*, 59 F.4th 180, 197 (5th Cir. 2020). Plaintiffs are incorrect as a matter of law that the Corps currently has a mandatory duty to apply for an incidental take authorization under the MMPA. As described above, the MMPA is not like other environmental statutes, such as the ESA or NEPA, that contain citizen-suit provisions and nondiscretionary duties whereby agencies procedurally must take certain actions. The MMPA does not contain any pre-take triggering point or standard by which a U.S. citizen *must* apply for an incidental take authorization; the decision to apply for an authorization is discretionary. Moreover, Plaintiffs have not provided, and cannot provide, any facts to show that the Corps has a nondiscretionary duty because there are no facts showing that opening the Spillway in the next five years (the maximum duration of an incidental take permit under 16 U.S.C. § 1371(a)(5)(A)) will cause take of bottlenose dolphins. Indeed, the Corps may not even need to open the Spillway in the next five years, a fact that Plaintiffs do not address. Because the Corps' decision to apply for an incidental take permit is discretionary, and Plaintiffs have not provided enough information to "permit the court to infer more than the mere possibility of misconduct," *Iqbal*, 556 U.S. at 679, this Court cannot declare that the Corps has unlawfully withheld or unreasonably delayed action. *See SUWA*, 542 U.S. at 63 ("[T]he only agency action that can be compelled under the APA is action legally *required*."). Thus, Plaintiffs have failed to state a claim for which relief can be granted.

## CONCLUSION

For the foregoing reasons, Federal Defendant respectfully requests that the Court grant its

Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).


Date: March 25, 2024                          Respectfully submitted,

                                              TODD KIM, Assistant Attorney General
                                              S. JAY GOVINDAN, Section Chief
                                              MEREDITH FLAX, Deputy Section Chief
                                              U.S. Department of Justice
                                              Environment & Natural Resources Division

                                              */s/ Taylor A. Mayhall*
                                              TAYLOR A. MAYHALL
                                              Trial Attorney
                                              U.S. Department of Justice
                                              Environment & Natural Resources Division
                                              Wildlife and Marine Resources Section
                                              4 Constitution Square
                                              150 M Street NE
                                              Washington, DC 20002
                                              Tel: (202) 598-3796
                                              Fax: (202) 305-0275
                                              Email: taylor.mayhall@usdoj.gov

                                              LAUREN DICK
                                              Assistant United States Attorney
                                              1575 20th Avenue
                                              Gulfport, MS 39501
                                              GA Bar # 401353
                                              Tel: (228) 563-1560
                                              Fax: (228) 563-1571
                                              Email: lauren.dick@usdoj.gov

                                              *Attorneys for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 25, 2024, I electronically filed the foregoing Memorandum of Law in Support of Federal Defendant's Motion to Dismiss with the Clerk of the Court for the United States District Court for the Southern District of Mississippi using the CM/ECF system, which will send electronic notification of such filing to all counsel of record.

*/s/ Taylor A. Mayhall*

Counsel for Defendant