## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

HARRISON COUNTY, MISSISSIPPI;
CITY OF BILOXI, MISSISSIPPI;
CITY OF D'IBERVILLE,
MISSISSIPPI; CITY OF PASS
CHRISTIAN, MISSISSIPPI;
MISSISSIPPI HOTEL AND
LODGING ASSOCIATION; and
MISSISSIPPI COMMERCIAL
FISHERIES UNITED, INC.                                    **PLAINTIFFS**

v.                                          **CAUSE NO. 1:24CV21-LG-BWR**

U.S ARMY CORPS OF ENGINEERS                          **DEFENDANT**

## MEMORANDUM OPINION AND ORDER GRANTING
## DEFENDANT'S MOTION TO DISMISS AND DENYING
## PLAINTIFFS' MOTION TO AMEND COMPLAINT

**BEFORE THE COURT** are the [6] Motion to Dismiss for Lack of

Jurisdiction and Failure to State a Claim filed by Defendant U.S. Army Corps of

Engineers ("the Corps") and the [14] Motion for Leave to File Second Amended

Complaint filed by Plaintiffs Harrison County, City of Biloxi, City of D'Iberville,

City of Pass Christian, Mississippi Hotel and Lodging Association, and Mississippi

Commercial Fisheries United, Inc., in this lawsuit filed pursuant to the

Administrative Procedure Act ("APA"), 5 U.S.C. § 706, and the Marine Mammal

Protection Act ("MMPA"), 16 U.S.C. § 1361 et seq.  The parties have fully briefed

both Motions.  After reviewing the submissions of the parties, the record in this

matter, and the applicable law, the Court finds that the Motion to Dismiss should

be granted because Plaintiffs do not have standing to pursue this lawsuit.  The

Court further finds that Plaintiffs' Motion to Amend their Complaint should be denied because amendment would be futile.

## BACKGROUND

The Corps is responsible for designing, constructing, and operating flood control projects for the Mississippi River. *See* 33 U.S.C. § 701b; [1 ¶15]. It constructed the Bonnet Carré Spillway (hereafter referred to as "the Spillway") upstream of New Orleans, Louisiana, in order to divert water from the Mississippi River into Lake Pontchartrain when river levels reach a certain stage. *Id.* at ¶17. After entering Lake Pontchartrain, the water diverted by the Spillway flows into Lake Borgne and the Mississippi Sound. *Id.* While the Spillway's purpose is to protect the City of New Orleans from an "overwhelming" flood, "its injection of freshwater into Lake Pontchartrain and the Mississippi Sound . . . takes a toll on a host of environmental and economic interests, causing everything from disruptions to oysters, sea turtles, and shrimp, to toxic algae blooms, seafood warnings, and beach closures." *Harrison County, Miss. v. U.S. Army Corps of Eng'rs*, 63 F.4th 458, 460 (5th Cir. 2023).[1]

---

[1] In *Harrison County., Miss. v. U.S. Army Corps of Engineers*, the Fifth Circuit affirmed the dismissal of a claim previously filed by Plaintiffs against the Corps pursuant to the National Environmental Policy Act ("NEPA"). 63 F.4th at 461. The Fifth Circuit held that the Corps did not have a duty to file a supplemental Environmental Impact Statement concerning increased Spillway openings under NEPA. *Id.* at 466. The Firth Circuit explained, "For better or worse, Congress and the Corps have authority to act on the plaintiffs' dire environmental concerns. The federal courts do not." *Id.*

Plaintiffs are local governments and non-profit organizations operating near the Mississippi Sound. [1 ¶¶9–14]. They claim that the MMPA requires the Corps to apply for an incidental take authorization from the United States Department of Commerce because operation of the Spillway may result in a "take" of a marine mammal, the bottlenose dolphin. *Id.* at ¶4. The term "take," as it is used in the MMPA, "means to harass, hunt, capture, or kill, attempt to harass, hunt, capture, or kill any marine mammal." 16 U.S.C. § 1362(13). The MMPA's regulations interpret "'harass' (and therefore 'take') to include negligent acts that indirectly disturb or molest a marine mammal." *United States v. CITGO Petroleum Corp.*, 801 F.3d 477, 490 (5th Cir. 2015) (citing 50 C.F.R. § 216.3).

In 2019, the Corps opened the Spillway twice, for a total of 120 days. [1 ¶20]. During that time, Plaintiffs claim that "[t]he massive volumes of polluted fresh water diverted through the . . . Spillway and into the Mississippi Sound caused direct and indirect mortality of resident bottlenose dolphins." *Id.* at ¶5. They further allege that the dolphins that survived "developed extremely painful and debilitating skin lesions." *Id.* In this lawsuit, Plaintiffs allege:

> 35. The Corps' taking of bottlenose dolphins in 2019 constitutes an agency action contrary to law under Section 706 of the Administrative Procedure Act, 5 U.S.C. § 706 in that it is contrary to the taking moratorium in the Marine Mammal Protection Act.

> 36. The Corps' taking of bottlenose dolphins in 2019 without obtaining an incidental take authorization also constitutes agency action unlawfully withheld or unreasonably delayed under Section 706 of the Administrative Procedure Act, 5 U.S.C. § 706.

*Id.* at ¶¶35–36. Plaintiffs ask the Court to:

1.  Enter a declaratory judgment that the Corps of Engineers has acted contrary to law and/or unlawfully withheld or unreasonably delayed agency action in taking bottlenose dolphins through the operation of the Bonnet Carré Spillway and failing to obtain an incidental take permit;

2.  Order the Corps of Engineers to fully comply with the requirements of the Marine Mammal Protection Act with all due haste, pursuant to a schedule established and supervised by this Court;

3.  Require the Corps to take action to avoid take of bottlenose dolphins through operation of the Bonnet Carré Spillway;

4.  Award the plaintiffs their attorneys' fees and costs as required by applicable rules and statutes; and

5.  Award such other and further relief as is proper in the premises.

*Id.* at p. 13.

## DISCUSSION

## I.  OVERVIEW OF MMPA AND APA

Congress passed the MMPA in 1972 because "certain species and population stocks of marine mammals are, or may be, in danger of extinction or depletion as a result of man's activities."  16 U.S.C. § 1361(1).  It determined that:

> [S]uch species and population stocks should not be permitted to diminish beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part, and, consistent with this major objective, they should not be permitted to diminish below their optimum sustainable population.

16 U.S.C. § 1361(2).  To accomplish this, Congress enacted a "moratorium on the taking and importation of marine mammals and marine mammal products."  16 U.S.C. § 1371(a).  Despite this moratorium, the Secretary of Commerce may issue permits or authorizations for the taking of marine mammals.  16 U.S.C. § 1371(a).

For example, the Secretary is required to allow, during periods of not more than five consecutive years each, citizens engaged in a specific activity within a specified geographical area to take small numbers of marine mammals of a species or population stock if the Secretary, after notice and opportunity for public comment:

> (I) finds that the total of such taking during each five-year (or less) period concerned will have a negligible impact on such species or stock and will not have an unmitigable adverse impact on the availability of such species or stock for taking for subsistence uses . . . and
>
> (II) prescribes regulations setting forth—
>
>> (aa) permissible methods of taking pursuant to such activity, and other means of effecting the least practicable adverse impact on such species or stock and its habitat, paying particular attention to rookeries, mating grounds, and areas of similar significance, and on the availability of such species or stock for subsistence uses; and
>>
>> (bb) requirements pertaining to the monitoring and reporting of such taking.

16 U.S.C. § 1371(a)(5)(A).

The National Marine Fisheries Service ("NMFS")[2] promulgated regulations implementing the MMPA. 50 C.F.R. §§ 216.1, 216.101. United States citizens seeking an incidental take authorization must submit a written request to NMFS's Assistant Administrator that contains information specified by regulation. *Id.* at 216.104(a). After a citizen's request is determined to be "adequate and complete," the Assistant Administrator publishes notice in "the Federal Register, newspapers of general circulation, and appropriate electronic media in the coastal areas that

---

[2] NMFS is an office within the National Oceanic and Atmospheric Administration, which is a bureau within the United States Department of Commerce.

may be affected by" the proposed taking of marine mammals. *Id.* at § 216.104(b).

In this notice, NMFS "will invite information, suggestions, and comments for a

period not to exceed 30 days from the date of publication in the Federal Register."

*Id.* at § 216.104(b)(2). If the Assistant Administrator finds that the proposed taking

would have "more than a negligible impact on the species or stock of marine

mammal or would have an unmitigable adverse impact on the availability of such

species or stock for subsistence uses," the request will be denied. *Id.* at §

216.104(d). "Any preliminary findings of 'negligible impact' and 'no unmitigable

adverse impact' shall be proposed for public comment along with either the

proposed incidental harassment authorization or the proposed regulations for the

specific activity." *Id.* at § 216.104(c). If NMFS decides to approve an incidental

take authorization, it is required to promulgate specific regulations that set forth:

> (1) [p]ermissible methods of taking;
>
> (2) [m]eans of effecting the least practicable adverse impact on the species and its habitat and on the availability of the species for subsistence uses; and
>
> (3) [r]equirements for monitoring and reporting, including requirements for the independent peer-review of proposed monitoring plans where the proposed activity may affect the availability of a species or stock for taking for subsistence uses.

*Id.* at § 216.105.

The MMPA provides that a person who violates any of its provisions or any

permit or regulation issued thereunder "may be assessed a civil penalty by the

Secretary of not more than $10,000 for each violation" after notice and an

opportunity for a hearing. 16 U.S.C. § 1375(a)(1). If a person fails to pay the

penalty assessed, the Secretary can ask the Attorney General to file a civil action against that person in a federal district court.  *Id.*  Furthermore, "[a]ny person who knowingly violates any provision of [the MMPA] or of any permit or regulation issued thereunder . . . shall, upon conviction, be fined not more than $20,000 for each such violation, or imprisoned for not more than one year, or both."  *Id.* at § 1375(b).

The MMPA only provides a private right of action to persons contesting the Secretary's decision to grant or deny a permit.  16 U.S.C. § 1374(d)(6); *see also* 16 U.S.C. § 1377(a) ("Except as otherwise provided in this subchapter, the Secretary shall enforce the provisions of this subchapter.").  Since this lawsuit does not concern the grant or denial of a permit, but a separate agency's alleged failure to seek a permit from the Secretary, the parties agree that Plaintiffs can only allege violations of the MMPA to the extent authorized by the APA.

The APA gives a person[3] "suffering legal wrong because of agency action or adversely affected or aggrieved by agency action" the right to obtain judicial review of particular agency actions.  5 U.S.C. § 702.  This review is limited to "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.  The APA also provides relief for an agency's failure to act in § 706(1), which requires a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).

---

[3] The APA provides that the term "'person' includes an individual, partnership, corporation, association, or public or private organization other than an agency."  5 U.S.C. § 551(2).

"Thus, a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004).

## II. STANDING

The Constitution gives federal courts the power to adjudicate only genuine "cases" and "controversies." Art. III, § 2. "For there to be a case or controversy under Article III, the plaintiff must have a personal stake in the case — in other words, standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (internal quotation marks omitted). The three requirements of standing are: (1) an injury in fact; (2) a causal connection between the injury and the conduct complained of; and (3) redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

"[A]t the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating each element'" of standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 498–499 (1975)). "'[G]eneral factual allegations of injury from a defendant's conduct may suffice' to establish standing." *Stallworth v. Bryant*, 936 F.3d 224, 230 (5th Cir. 2019) (quoting *Lujan*, 504 U.S. at 561). Therefore, a court "will not dismiss for lack of standing if [it] reasonably can infer from the plaintiffs' general allegations that they have standing." *Id.* This inference must be reasonable because "[a] federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing." *Id.*

While evaluating standing,

> courts must accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party.  At the same time, it is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing.  If, after this opportunity, the plaintiff's standing does not adequately appear from all materials of record, the complaint must be dismissed.

*Warth*, 422 U.S. at 501–02.  The plaintiff bears the burden of demonstrating it had standing at the time the lawsuit was filed for each claim it asserts.  *Consumers' Rsch. v. Fed. Commc'ns Comm'n*, 109 F.4th 743, 752–53 (5th Cir. 2024); *El Paso Cty., Tex. v. Trump*, 982 F.3d 332, 338 (5th Cir. 2020).

   Where, as here, plaintiffs are seeking injunctive and declaratory relief, they "can satisfy the redressability requirement only by demonstrating a continuing injury or threatened future injury."  *See Crawford v. Hinds Cnty. Bd. of Supervisors*, 1 F.4th 371, 375 (5th Cir. 2021).  "That threatened injury must be an injury in fact."  *Id.* (citation and quotation marks omitted).  Therefore, the injury must be imminent, and "there must be at least a substantial risk that the injury will occur."  *Id.*  "The plaintiff must show that he . . . is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the . . . threat of injury must be both real and immediate, not conjectural or hypothetical."  *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983) (quotation marks omitted).

   Plaintiffs' Complaint includes a few allegations of future harm.  First, they allege that "Biloxi's interests and those of its citizens have been and will be harmed by the Corps' failure to act in the permitting process for incidental take of

bottlenose dolphins . . . ."  [1 ¶9].  They further claim that the interests of Harrison County, Pass Christian, the Mississippi Hotel and Lodging Association and its members, and the Mississippi Commercial Fisheries United, Inc., and its members will be harmed in the same way.  *Id.* at ¶¶10, 12–14.

Plaintiffs have also submitted declarations in support of their opposition to the Corps' Motion to Dismiss.  For example, Mayor A.M. Gilich, Jr., testifies that the City of Biloxi "has approximately 243 miles of shoreline, plus another approximately 50 miles of small bayous and inlets."  [9-2 ¶3].  He opines, "It is impossible to separate the health and economy of the City of Biloxi from the health of the coastal waters and wildlife affected by the . . . Spillway, including the bottlenose dolphin."  *Id.*  He explains that tourism is central to Biloxi's economy, and dolphin strandings cause "direct reputational damage to the City," causing visitors and locals to "question the health and safety of humans on the City's beaches and adjacent waters."  *Id.*

Mayor Gilich further testifies that the value of Biloxi's real and personal property, such as its Small Craft Harbor and Marina, is "dependent on a healthy Mississippi Sound estuary and visible perception of a healthy estuary as signaled by the health and visible perception of health of bottlenose dolphins."  *Id.* at ¶6.  Approximately fifteen dolphins were stranded in Biloxi during the 2019 Spillway opening, and approximately ten of them "washed up in Biloxi" during the 2011 Spillway opening.  *Id.* at ¶10.  He notes that hotel occupancy rates in Biloxi and

Harrison County were "materially reduced" in 2019 due to the Spillway opening.

*Id.* at ¶9.  He also opines:

> [C]ontinued openings of the . . . Spillway[,] which recent history
> indicates are accelerating, will negatively affect the income-producing
> value of the City's leasehold interest in the waterfront property it
> jointly leases with the State and [the Mississippi Board of Trustees of
> Institutions of Higher Learning] to Golden Nugget [Casino & Hotel].

[9-2 ¶7].

Harrison County has submitted very similar testimony in a declaration

signed by the President of its Board of Supervisors, Marlin Ladner.  He states:

> The County is vested with a real property easement to the 26-mile
> sand beach south of Highway 90 with the right and duty to adopt and
> enforce reasonable regulations with respect to the use of the beach by
> the public and to protect the public's interest in the health, safety, and
> welfare of the public's use and enjoyment of the beach, all of which
> depend on the health and well-being, and a positive perception of the
> health and well-being, of the Mississippi Sound bordering the sand
> beach and the bottlenose dolphin[s] that live there.

[9-3 ¶5].  He asserts that the value of the County's beach easement and other

property interests is "materially devalued by the harmful effects of diverted

Mississippi River water on the bottlenose dolphin." *Id.* at ¶6.  He opines that

distressed, ill, and dying dolphins "warn of disease and danger to human and

marine life." *Id.*

Plaintiffs have also submitted a declaration signed by Louis Skrmetta, the

President and Chief Operating Officer of Pan Isles, Inc., which does business as

Ship Island Excursions and is a member of Plaintiff Mississippi Hotel and Lodging

Association.  [9-4 ¶¶3, 5].  He testifies about the importance of bottlenose dolphins

to Pan Isles' business, and he mentions that "revenue from dolphin cruises helped

save [the] company" when Ship Island was closed due to Covid-19 restrictions in 2020. *Id.* at ¶¶4–10.

The Executive Director of Plaintiff Mississippi Hotel and Lodging Association, Linda Hornsby, also opines by declaration:

> The presence on the beaches and images in the media of dead and dying dolphins make it more likely that visitors will pick an alternative destination. Unfortunately, history has proven that, when we lose visitors to other destinations, they are often gone not just for that year but for years to come.

[9-6 ¶5]. She further testifies, "Situations like 2019, when we had dead dolphins as well as all the other related impacts of prolonged openings of the . . . Spillway, directly harm our members and also harm the Association, which depends on those members." *Id.* at ¶6.

A sixth-generation commercial fisherman and President of Plaintiff Mississippi Commercial Fisheries United, Frank Parker, has also submitted a declaration in which he testifies that it "really pained [him]" to see what he called "zombie dolphins — sick and with sores all over them" while fishing in the Ocean Springs harbor while the Spillway was open in 2019. [9-6 ¶3]. He further surmises,

> And when you have these dolphins washing up dying or dead on the beach people will look at that and say I don't want to be eating something that comes out of that water. It changes the perception of our seafood from something that's healthy to something that might be dangerous.

*Id.* at ¶4.

Finally, Plaintiffs have submitted a declaration signed by Mobashir "Moby" Solangi, Ph.D., the executive director of the Institute of Marine Mammal Studies,

Inc. ("IMMS"), which "is a 501(c)(3) non-profit organization established in 1984 for the purposes of public education, conservation, and research on marine mammals in the wild and under human care." [9-1 ¶2]. He testifies that 142 sick or dead bottlenose dolphins were "stranded on the waterfront within Mississippi" during the periods when the Spillway was open in 2019, and 101 dolphins were stranded during the 2011 Spillway opening. *Id.* at ¶3. He opines that "[t]he health and life of the bottlenose dolphin are negatively impacted by prolonged exposure to [a] large quantity of fresh water [released from the Mississippi River during Spillway openings] as it drastically changes the marine and estuarine environment that these animals are biologically adapted to." *Id.* at ¶4. He also testifies that "the mortality of dolphins was more pronounced in the western [S]ound, where the influx of the Mississippi River water was greatest." *Id.* at ¶10. He further explains:

> Dolphins are long-lived species and have an average age of 20-25 years, with some living up to 50-years and beyond. Therefore, extensive mortality in various age classes can significantly affect the duration in which the population can recover from such events. It could take many years to restore a population after an episode such as 2011 and 2019. The dolphin population in Mississippi has suffered considerable mortality during the 2011 and 2019 opening of the Bonnet Carré Spillway. According to various surveys, there has been a decline in the dolphin population as compared to the size of the population prior to 2010.

*Id.* at ¶5. He also concludes that a decrease in the dolphin population impacts tourism and the local economy of the Mississippi Gulf Coast. *Id.* at ¶7.

While the past injuries discussed in these declarations "are evidence of the likelihood of a future injury," they "do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy." *See*

*Crawford*, 1 F.4th at 375 (brackets and quotation marks omitted). Furthermore, while Plaintiffs claim that their injuries from dolphin strandings can last for years, they have not alleged that they continued to suffer injuries from the 2019 Spillway opening when they filed their Complaint on January 22, 2024. *See Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 448 (5th Cir. 2019) ("In identifying an injury that confers standing, courts look exclusively to the time of filing.").

In a further attempt to establish a future injury, Plaintiffs quote the following statements made by the Fifth Circuit in the previous lawsuit they filed concerning Spillway openings:

> Exacerbating these externalities is a marked—and unexpected—increase in the frequency with which the Spillway must be used, which itself has been accelerated by changing river conditions that make reliance on the Spillway an increasingly common fact of life. . . . Some expect that matters will only get worse. An LSU analysis, for example, projects a notable increase in river flow "as a result of riverbed aggradation" and "sand bar growth," and, perhaps more predictably, rising global temperatures and intensified hydrologic cycles.

[10 p. 25] (quoting *Harrison County*, 63 F.4th at 460–461). Plaintiffs also cite a 2017 Climate Science Special Report to support their statement that "precipitation in the upper Mississippi River has increased 5-15% since 1895, and the amount of rain in the heaviest downpours has increased by an even higher percentage." [10 p. 21]. In addition, they point to a 2023 Fifth National Climate Assessment in support of their argument that "future increases in precipitation in the Midwest are expected, cumulative runoff in the Mississippi River System has increased in recent decades and is projected to continue increasing through mid-century." *Id.* According to Plaintiffs, the fact that Spillway openings have caused a "take" of

dolphins at least twice in the past thirteen years is evidence of the likelihood of a future injury. [10 p. 26] (citing *Crawford*, 1 F.4th at 375). They claim these past events, when combined with predictions of increased flooding of the Mississippi River, take their claims beyond the realm of speculation.

The Corps responds that the last Spillway opening was over four years ago, between April 3, 2020, and May 1, 2020. Plaintiffs have not alleged that dolphin strandings were elevated during that time, and they rely on a declaration from Mr. Skrmetta that "revenue from . . . dolphin cruises helped save" his family business in 2020, a year when the Spillway was opened. [9-4 ¶10]. Plaintiffs also have not alleged that the 2016 Spillway opening caused an increase in dolphin strandings; they only reference the 2011 and 2019 Spillway openings as being harmful to dolphins. Finally, it is unclear from information provided by Plaintiffs when precipitation levels may increase sufficiently to cause an increase in flooding and Spillway openings.

Although the Court is concerned about the detrimental effects that Spillway openings have on the Mississippi Sound and the dolphins that inhabit it, the Court agrees with the Corps' arguments. As this Court has previously noted:

> The Corps opened the Spillway in January 1937 for 48 days, March 1945 for 57 days, February 1950 for 38 days, April 1973 for 75 days, April 1975 for 13 days, April 1979 for 45 days, May 1983 for 35 days, March 1997 for 31 days, April 2008 for 31 days, May 2011 for 42 days, January 2016 for 23 days, March 2018 for 23 days, February 2019 for 44 days, May 2019 for 78 days, and April 2020 for 28 days.

*Harrison County, Mississippi v. Miss. River Comm'n*, No. 1:19CV986-LG-RPM, 2021 WL 4164679, at *2 (S.D. Miss. Sept. 13, 2021), *aff'd sub nom. Harrison County,*

*Mississippi v. United States Army Corps of Eng'rs*, 63 F.4th 458 (5th Cir. 2023). Thus, the frequency and length of Spillway openings is unpredictable. Plaintiffs have alleged that the 2011 and 2019 openings caused an increase in dolphin strandings, but Plaintiffs have not claimed that the most recent Spillway opening in 2020, or the Spillway openings in 2016 and 2018 were harmful to dolphins. As a result, the harm that Spillway openings poses to dolphins is also unpredictable.

The purpose of the imminence requirement "is to ensure that the alleged injury is not too speculative for Article III purposes — that the injury is certainly impending." *Crane v. Johnson*, 783 F.3d 244, 251 (5th Cir. 2015). Therefore, "allegations of *possible* future injury are not sufficient." *Id.* at 251–52 (emphasis added). The threat must be both substantial and immediate. *Crawford*, 1 F.4th at 375. The possibility of future harm claimed by Plaintiffs is too speculative to constitute an injury-in-fact for Article III standing purposes.

Furthermore, even if Plaintiffs could demonstrate an Article III injury in fact, it is unlikely that Plaintiffs can establish the causation and redressability elements because their claims hinge on decisions made by a third party — the NMFS. As the Supreme Court has held, "where a causal relation between injury and challenged action depends upon the decision of an independent third party . . . standing is not precluded, but it is ordinarily substantially more difficult to establish. . . ." *California v. Texas*, 593 U.S. 659, 675 (2021). Therefore, if the Court requires the Corps to file an application for an incidental take authorization, NMFS may decide to authorize the Corps to "take" dolphins when opening the Spillway. The Court

recognizes that NMFS may find a way through regulation to place restrictions on Spillway openings that would hopefully lessen environmental harm, but this possibility is insufficient to satisfy the redressability requirement of standing. *See Lujan*, 504 U.S. at 561 ("[I]t must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.") (internal citation marks omitted).

Nevertheless, Plaintiffs claim that they have suffered a procedural injury for which the imminence and redressability requirements of standing are relaxed. The Supreme Court recognized procedural injuries in the following footnote to its opinion in *Lujan*:

> There is this much truth to the assertion that "procedural rights" are special: The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy. Thus, under our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years.

504 U.S. at 572 n.7. The Fifth Circuit has explained that procedural injuries "occur when a defendant fails to follow a procedure, and this failure increases the risk of future harm." *City of Hearne, Texas v. Johnson*, 929 F.3d 298, 301 (5th Cir. 2019). "When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts v. E.P.A.*, 549 U.S. 497, 518 (2007). Thus, a plaintiff must show that the omitted

"procedural step was connected to a substantive result." *Id.* "Only a person who

has been accorded a procedural right to protect his concrete interests can assert

that right without meeting all the normal standards for redressability and

immediacy." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009); *see also*

*Sierra Club v. Glickman*, 156 F.3d 606, 613 (5th Cir. 1998) ("[T]he plaintiff must

show that the procedures in question are designed to protect some threatened

concrete interest of [the plaintiff] that is the ultimate basis of its standing.")

(brackets and citation omitted).

Plaintiffs claim that "the incidental take authorization process has multiple

procedural safeguards including notice and comment, and the Plaintiffs here will all

utilize those procedural safeguards if the Corps complies with the law." [10 p. 21].

They further explain:

> Here the decision that harmed the Plaintiffs was [the Corps'] repeated
> action of opening the Bonnet Carré Spillway without going through the
> incidental take authorization process, with all of its attendant
> analytical and procedural protections. The Plaintiffs certainly hope
> that a decision by the Court would prompt the Corps to reconsider the
> legality of this decision and undertake the incidental take
> authorization process.

*Id.* at 24.

However, the MMPA does not impose any standards or procedures for

determining whether to file an application for an incidental take authorization. It

merely establishes procedures by which the Secretary of Commerce, by and through

NMFS, decides whether an application for an incidental take authorization should

be granted. *See* 16 U.S.C. §§ 1371(a)(5)(A); 16 U.S.C. § 1362(12)(A)(i).

Therefore, all the procedures set forth in the MMPA and its regulations pertain to an ultimate decision by NMFS, not the Corps, and these procedures take place after an application for incidental take authorization has been filed. For this reason, the Plaintiffs' argument that their participation in notice and comment before the NMFS may "prompt the Corps to reconsider . . . and undertake the incidental take authorization process" is not well taken. [10 p. 24]. Assuming that the Plaintiffs have successfully alleged a procedural injury, none of them can satisfy even the lessened redressability standard required for standing.

## III. PLAINTIFFS' MOTION TO AMEND

Plaintiffs have filed a [14] Motion to Amend their Complaint to include an alternative claim that "the Corps' issuance of the 1999 Water Control Manual for the Bonnet Carré Spillway without obtaining an incidental take authorization constitutes agency action unlawfully withheld or unreasonably delayed under Section 706 of the Administrative Procedure Act, 5 U.S.C. § 706." [14-1 ¶37].

Courts are required to "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). However, "[t]he district court is entrusted with the discretion to grant or deny a motion to amend and may consider a variety of factors including . . . futility of the amendment." *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014) (quotation marks omitted). Plaintiffs lack standing to pursue the alternative claim included in their proposed amended complaint for the same reason that they lack standing as to their existing claims. As a result, amendment of the Complaint would be futile.

## CONCLUSION

"[I]t is well settled that the federal courts established pursuant to Article III of the Constitution do not render advisory opinions; concrete legal issues, presented in actual cases, not abstractions are requisite." *Am. Stewards of Liberty v. Dep't of Interior*, 960 F.3d 223, 228 (5th Cir. 2020). "This fundamental limitation preserves the tripartite structure of our Federal Government, prevents the Federal Judiciary from intruding upon the powers given to the other branches, and confines the federal courts to a properly judicial role." *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 438 (2017).

Plaintiffs ask the Court to require the Corps to undertake the marine mammal take authorization process, and they claim that this requirement would redress the losses they expect to suffer during Spillway openings at some point in the future. However, the timing, frequency, and environmental damage caused by future Spillway openings is dictated by unpredictable weather patterns. And, the decision whether to authorize the taking of a marine mammal is made by NMFS, an office within NOAA and the Department of Commerce that is not a party to this lawsuit. Plaintiffs and the Court can only speculate as to what that decision may be. For example, NMFS may authorize the Corps to take dolphins during Spillway openings, thus potentially leaving Plaintiffs in the same position they were in when this lawsuit began.

Under these circumstances, none of the plaintiffs have alleged facts supporting a finding of Article III standing for any of their claims. Furthermore,

amendment of Plaintiffs' Complaint in order to add an additional claim that seeks equally speculative relief would be futile. Since a decision in this lawsuit would cause the Court to overstep authority it was granted by the United States Constitution, this lawsuit must be dismissed for lack of jurisdiction.

**IT IS THEREFORE ORDERED AND ADJUDGED** that the [6] Motion to Dismiss filed by Defendant U.S. Army Corps of Engineers is **GRANTED**. This lawsuit is **DISMISSED** for lack of jurisdiction. The Court will enter a separate judgment pursuant to Fed. R. Civ. P. 58(a).

**IT IS FURTHER ORDERED AND ADJUDGED** that the [14] Motion for Leave to File Second Amended Complaint filed by Plaintiffs Harrison County, City of Biloxi, City of D'Iberville, City of Pass Christian, Mississippi Hotel and Lodging Association, and Mississippi Commercial Fisheries United, Inc., is **DENIED**.

**SO ORDERED AND ADJUDGED** this the 18th day of September, 2024.

s/ *Louis Guirola, Jr.*

LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE